**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-cv-00989-MEH

TIFFANY LITZSINGER,

    Plaintiff,

v.

ADAMS COUNTY CORONER'S OFFICE,

    Defendant.

**ORDER**

**Michael E. Hegarty, United States Magistrate Judge.**

    Plaintiff Tiffany Litzsinger ("Plaintiff") was a medicolegal death investigator for the Adams County Coroner's Office ("Defendant") for about five years. Plaintiff's supervisors were Monica Broncucia-Jordan ("Coroner") and Sherronda Appleberry ("Chief Deputy Coroner"). Defendant terminated Plaintiff's employment in September 2018, the circumstances of which are the subject of this lawsuit under the Americans with Disabilities Act ("ADA") and the Family Medical Leave Act ("FMLA"). Plaintiff contends that Defendant terminated her in retaliation for taking FMLA leave for her disabilities. Defendant filed a motion for summary judgment ("Motion") as to both of Plaintiff's claims: ADA and FMLA retaliation. ECF 19. For the reasons described herein, the Motion is granted.

**FINDINGS OF FACT**

    The following are the Court's findings of material facts that are relevant and either undisputed or supported by the record, when viewed in the light most favorable to Plaintiff as the non-moving party.

1. Plaintiff began working for Defendant in January 2013. Compl. ¶ 3.

2. Around a year later, Plaintiff received a Letter of Counseling on January 13, 2014 informing her that, "In the past 3 months, Investigator Litzsinger has had some missing information on the following co-sign cases, A13-2463 GUERRA, A13-2980 STECKLINE, and A14-57 HOWLETT, causing additional work for management and/or administrative staff and increased wait time for the funeral homes and families." Exh. A, Plaintiff's Depo at 27:12-15; Exh. B, Depo. Exh. 1.

3. Plaintiff received another Letter of Counseling on August 22, 2014 informing her, "It is important to meet deadlines . . . . It is important to work on primary responsibilities before secondary ones, such as studying. It is unfair when some people meet deadlines and others do not thus consequences are needed for those that do not meet the deadlines . . . . Investigator Litzsinger is expected to stay reasonably caught up with her medical record review." Exh. A at 31:3–24; Exh. C, Depo. Exh. 2.

4. Plaintiff received a Written Reprimand on March 19, 2015 that documented her failure to follow policies, failure to follow directives given by management, failure to complete investigations in a timely manner, and failure to communicate promptly and effectively via email. Exh. A at 34:15–37:7; Exh. D, Dep. Exh. 3.

5. The Coroner's Office policies referenced in this Written Reprimand were: 1.13 Employee Contact by Management, 1.16 Employee Personal Contact Information, 1.25 Insubordination, 1.56 Discipline, 2.19 Time Records, and 3.9 Case Completion. Exh. A at 34:15–37:7; Exh. D.

6. Plaintiff received a Disciplinary Suspension Without Pay on April 22, 2015 for "Failure to Follow Policy, Failure to Follow Directives Given by Management, Reference(s): 1.25

Insubordination, 1.56 Discipline, 2.19 Time Records, 4.1 Discipline Procedure." Exh. A 37:8–19; Exh. E, Depo. Exh. 4.

7.  On September 13, 2017, Plaintiff received a Letter of Counseling for insubordination. Exh. A at 38:13–21; Exh. F, Depo. Exh. 5.

8.  This Letter of Counseling, written from the perspective of the Coroner, indicated, "I sent an email on 08/17/2017 advising that Investigator Litzsinger's completed self-appraisal was due by the end of the day on 08/31/2017. I didn't receive an appraisal from Investigator Litzsinger by the due date so a second email was sent to her on 09/05/2017 advising that the self-appraisal needed to be turned in ASAP. As of the end of 09/12/2017, nearly 1 month from the date of the original notification, I have not received Investigator Litzsinger's appraisal." Exh. A at 38:13–21; Exh. F.

9.  Plaintiff's history of struggling to keep up with record review and case completion was further documented in the 2016 Performance Recap/2017 Yearly Performance Appraisal/2018 Performance Objective document that she received in January of 2018. Exh. A at 39:8–23; Exh. G. However, that document also stated that "[f]or the first time in her employment with the Office, Tiffany is staying abreast [of] her caseload when it comes to record review and case completion." Exh. G; Exh. 1 ¶ 2.

10. Each of these entries in Plaintiff's personnel file was preceded by at least one conversation wherein the Coroner or her Chief Deputy Coroner would discuss the performance issues with Plaintiff. Exh. A at 64:16–20; Exh. D.

11. Plaintiff does not deny any of the facts contained in any of the Letters of Counseling, Written Reprimand, or disciplinary suspension. Exh. A at 65:8–13.

12. Coroner's Office Policy 3.9 Case Completion provides guidelines for timely case completion for "coroner cases" and "non-coroner cases". Exh. A at 45:9–17; Exh. H, Depo. Exh. 7.

13. Plaintiff has missed deadlines set forth in the Case Completion policy. Exh. A at 46:5–21; Exh. H.

14. Coroner's Office Policy 1.11 Electronic Media Usage provides guidelines for appropriate use of electronic media. Exh. A at 47:15–48:24; Exh. I, Depo. Exh. 8.

15. Plaintiff estimated that she may have spent an average of sixty to ninety minutes per shift on the Internet for personal matters. Exh. 1 ¶ 5; Exh. A at 47:15–49:25; Exh. I.

16. Coroner's Office Policy 1.26 Job Performance provides, "Poor performance can lead to disciplinary action, up to an including termination." Exh. A at 51:23–52:5; Exh. J, Depo. Exh. 9.

17. Plaintiff acknowledges that her performance had fallen short, as indicated by the Letters of Counseling. Exh. A at 64:25–65:3.

18. Coroner's Office Policy 2.19 Time Records provides, in part, "An employee shall be held responsible for verifying the accuracy of time records before submitting them for use in preparing payroll checks." *Id.* at 52:9–19; Exh. K, Depo. Exh. 10.

19. Plaintiff agrees that she violated the Time Records policy by, for example, saying she was working on a report for sixty-five minutes, when in fact she spent thirty of those minutes on her photography website. Exh. A at 53:2–18.

20. Sometime in Spring 2018, the Coroner retained Nicoletti-Flater and Associates, a firm of psychologists, to provide resiliency training for her staff. The Coroner made this decision

sometime in 2017 because she acknowledged that her staff suffered secondary trauma from the nature of the work.  Exh. 3 at 64:17–65:10.

21. On August 9, 2018, Plaintiff left work by ambulance with an episode of chest pain. Exh. 1 ¶ 10.

22. The Coroner instructed Plaintiff that, due to the nature and timeframe of her requested leave, she would need to utilize FMLA leave.  Exh. A at 23:1–5, 87:13–14; Exh. N, Depo. Exh. 13.

23. Defendant's medical leave administrator, Unum, granted Plaintiff FMLA leave from August 9 through August 21, 2018, for her anxiety and depression.  Compl. ¶ 13.

24. Unum denied short-term disability coverage because such benefits were not payable for the first fourteen calendar days she was disabled.  Compl. ¶ 13.

25. Plaintiff received an email from the Coroner on August 10, 2018, that stated in part, "As previously discussed following the incident on 08/03, I was planning to meet with you on your workweek of 08/08 to discuss your job. However, now that you are on leave, we will have to move this meeting to a later date when you return. If I am out of the office upon your return, I will meet with you to have this discussion when you and I are both in the office again."  Exh. A at 61:4–20; Exh N.

26. That same day, the Coroner also sent an email to a psychologist at Nicoletti-Flater and Associates.  Exh. 2.  In the email, the Coroner describes her August 3, 2018 call with Plaintiff in which Plaintiff allegedly stated that she was not going to perform an exam on a decomposed body because she was feeling "burnt out."  *Id.*  The Coroner commented that she would be meeting with Plaintiff on August 9, 2018 to "discuss this incident, [Plaintiff's] overall performance, and whether or not she can do this job."  *Id.*  The Coroner also stated that "[i]t now appears that she is

going on FMLA via that route." *Id.* Near the end of the email, the Coroner remarked, "It is obviously highly suspect that this employee was going to try to abuse" the mental health program. *Id.* Finally, the Coroner asked that Nicoletti-Flater and Associates "refer any of [the coroner's] employees, that may be seeking psychological FMLA leave, to their own private psychologist." *Id.*

27. Plaintiff agrees that the Coroner had concerns about her job performance and had asked to talk to her about those concerns prior to Plaintiff requesting leave. Exh. A at 61:21–63:24; 85:17–23; Exh 2.

28. The Chief Deputy Coroner sent an email to Adams County payroll/benefits on August 17, 2018 to make sure Plaintiff got paid while she was out on leave. Exh. A at 58:7–17; Exh. M, Depo. Exh. 12.

29. The Coroner, Chief Deputy Coroner, and Plaintiff met on August 30, 2018 to discuss Plaintiff's performance issues. Exh. A at 67:17–23, 79:16–22; Exh. O–X, Depo. Exhs. 14–23.

30. During the August 30, 2018 meeting, the Coroner discussed a situation in which Plaintiff told the Chief Deputy Coroner that she could not come in to work because she was already scheduled to work at her secondary employment. Exh. O; Exh. 3 at 10:9–17.

31. Coroner's Office Policy 1.58 Secondary Employment and Volunteer Services states, in part, "Employees authorized to hold secondary employment and/or volunteer services shall do so with the understanding that it shall not interfere with their responsibility to the Office of the Coroner, adversely affect their work with the Office of the Coroner or the image of the Office, and/or render the employee unfit to perform their duties associated with the Office of the Coroner." Exh. A at 54:6–12; Exh. L, Depo. Exh. 11.

32.     During the August 30, 2018 meeting, Plaintiff told the Coroner and the Chief Deputy Coroner that she knew it was wrong to "pop on Facebook" and "check the updates on the news" while she was at work.  Exh. A at 68:20–69:13; Exh. Q, Depo. Exh. 16.

33.     During her deposition, Plaintiff agreed that she knew it (popping on Facebook) was wrong because she had access to the electronic media usage policy when she was hired with Defendant.  Exh. A at 69:14–17.

34.     Plaintiff agrees that she was behind on more cases than most of her coworkers.  Exh. A at 69:20–70:14; Exh. R.  In terms of workload, Plaintiff was third in terms of number of death investigations in 2014, third in 2015, second in 2016, first in 2017, Exh. 3 at 57:5–18, and seventh in 2018, Exh. BB at 57:13–20.

35.     During the August 30, 2018 meeting, the Coroner and Chief Deputy Coroner discussed Plaintiff's personal Internet use, fraudulent timecard entries, and being behind on her work.  Exh. A at 70:24–73:11; Exh. S, Depo. Exh. 18.

36.     The Coroner described that Plaintiff's web history showed that while she was at work, she was spending an average of two hours per shift using the Internet to look at things like dolphins, the moon, Linked-In, movies, shopping websites, Wayback, decoding social security numbers, tophatter, personal email, marathon pro compression, tuition fees, and her personal Facebook page.  Exh. S.

37.     The Coroner pointed out that several of these Internet use sessions occurred at times that Plaintiff had indicated on her timecard she was working on a report.  *Id.*

38.     The Coroner described one such personal Internet use session that had occurred during an hour that Plaintiff had requested as overtime.  Exh. S.

39. Plaintiff agrees that it was a policy violation for her to ask for overtime and then use that time to be on Facebook, shopping for clothes, and looking at puppies on the Internet. Exh. A at 71:22–72:2.

40. Plaintiff agrees that she violated the (electronic media usage) policy by being on Facebook, looking at puppies, shopping for clothes, and accessing her photography website. Exh. A at 72:7–13.

41. Plaintiff agrees that she was put on probation because she was behind on her work duties and because she was violating other policies. Exh. A at 73:1–11.

42. During the August 30, 2018 meeting, the Coroner listed some of the reasons to terminate Plaintiff's employment. Exh. A at 79:23–80:3; Exh. U, Depo. Exh. 20.

43. Those reasons included dereliction of duty, fraudulent records, using the Internet for personal use, and being consistently behind on her work. Exh. A at 79:23–80:3; Exh. U.

44. Plaintiff agrees that all those things were true, and that they were true and occurred prior to her ever asking for FMLA leave. Exh. A at 80:2–10.

45. In the August 30, 2018 meeting, Plaintiff agreed that the Coroner had "every reason" to terminate her. Exh. A at 84:16–21.

46. Plaintiff agrees that the Coroner was "more than fair" in giving her an opportunity at probation. Exh. A at 84:16–21.

47. Plaintiff agrees that the terms of her probation included doing her job while she was at work, not using the Internet for personal use, completing tasks by the deadline, following policies as written, and asking any questions she had as they came up. Exh. A at 76:22–77:8.

48. Plaintiff agrees that there was nothing about the terms of her probation that was confusing to her. Exh. A at 77:13–15.

49. Plaintiff's web history shows that after she was placed on probation, she checked Facebook on September 3, went to a login page for a United Power account on September 6, linked to a Mozilla Pocket page on September 7, accessed a summary of a Tenth Circuit decision regarding a Utah police officer that shot a dog on September 12, visited the Bennett Fire Department website and looked at several houses for sale on September 15. Exhs. Y, AA. Of these instances, Plaintiff only admits that one was for personal use: the United Power account. Exh. 1 ¶ 11. In addition, Plaintiff admits to showing coworkers photographs from her personal photography website. *Id.*

50. Plaintiff was terminated on September 16, 2018. Compl ¶ 21.

## LEGAL STANDARDS

A motion for summary judgment serves the purpose of testing whether a trial is required. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003). A court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The moving party bears the initial responsibility of providing to the court the factual basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the moving party has the burden of proof—the plaintiff on a claim for relief or the defendant on an affirmative defense—his[, her, or its] showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015) (quoting *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986)). "In other

9

words, the evidence in the movant's favor must be so powerful that no reasonable jury would be free to disbelieve it. Anything less should result in denial of summary judgment." *Id*. at 1154 (quoting 11 Moore's Federal Practice, § 56.40[1][c] (Matthew Bender 3d Ed. 2015)).  Only evidence for which the content and substance are admissible may be considered when ruling on a motion for summary judgment.  *Johnson v. Weld Cty., Colo.*, 594 F.3d 1202, 1210 (10th Cir. 2010).

If the movant properly supports a motion for summary judgment, the non-moving party has the burden of showing there are issues of material fact to be determined.  *Celotex*, 477 U.S. at 322.  That is, the opposing party may not rest on the allegations contained in his complaint but must respond with specific facts showing a genuine factual issue for trial.  Fed. R. Civ. P. 56(e); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."); see also *Hysten v. Burlington N. & Santa Fe Ry.*, 296 F.3d 1177, 1180 (10th Cir. 2002).  These specific facts may be shown "'by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves.'"  *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting Celotex, 477 U.S. at 324); *see Mountain Highlands, LLC v. Hendricks*, 616 F.3d 1167, 1170 (10th Cir. 2010) ("On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings  and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to [its] case in order to survive summary judgment.") (quoting *Cardoso v. Calbone*, 490 F.3d 1194, 1197 (10th Cir. 2007)). "The court views the record and draws all inferences in the light most favorable to the non-

moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

## ANALYSIS

Plaintiff asserts two claims against Defendant: FMLA Retaliation (Compl. ¶¶ 23–25) and ADA Retaliation (Compl. ¶¶ 26–28). Both of these claims are subject to the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973), and share the same prima facie elements. To state a prima facie claim for retaliation under either FMLA or ADA, a plaintiff must show that (1) she was engaged in a protected activity, (2) the defendant took an adverse employment action against her, and (3) there was a causal connection between the protected activity and the adverse action. *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1170 (10th Cir. 2006) (FLMA case); *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1264 (10th Cir. 2001) (ADA case). Once the prima facie claim is established, the burden shifts to the employer to provide a legitimate, nondiscriminatory reason for the adverse employment action. *Metzler*, 464 F.3d at 1170; *Selenke*, 248 F.3d at 1264. If the employer meets that burden, then the plaintiff must demonstrate that the employer's proffered reason is pretextual. *Metzler*, 464 F.3d at 1170; *Selenke*, 248 F.3d at 1264. Here, the parties' only dispute concerns whether Defendant's reasons for termination were pretextual.

Plaintiff may demonstrate pretext by showing that "'the proffered reason is factually false,' or that 'discrimination was a primary factor in the employer's decision.'" *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970 (10th Cir. 2017) (quoting *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1218 (10th Cir. 2013)). "This is often accomplished 'by revealing weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered reason, such that a reasonable fact finder could deem the employer's reason unworthy of credence.'" *Id*. (quoting

11

*Tabor*, 703 F.3d at 1216). In addition, Plaintiff may establish pretext "by demonstrating 'the defendant acted contrary to a written company policy,' an unwritten company policy, or a company practice 'when making the adverse employment decision affecting the plaintiff.'" *Id.* (quoting *Kendrick v. Penske Transp. Services, Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000)). Plaintiff argues four things demonstrate evidence of Defendant's pretext: the timing of the termination, an email from the Coroner, Defendant's alleged *post-hoc* reasons to justify termination, and the changing justifications for termination. Resp. at 15.

The evidence demonstrates that there is a history of performance issues for Plaintiff in her employment with Defendant. Plaintiff began working for Defendant in January 2013. Compl. ¶ 3. A year later, she received a Letter of Counseling stating that she had missing information on some cases. Exh. B. In August 2014, Plaintiff received another Letter of Counseling regarding her ability to meet medical record review deadlines. Exh. C. Less than a year later, on March 19, 2015, Plaintiff received a Written Reprimand concerning, in part, alleged failure to follow polices, to follow management directives, and timely complete investigations. Exh. D. Following this, Plaintiff received a Disciplinary Suspension Without Pay in April 2015 for "Failure to Follow Policy, Failure to Follow Directs Given by Management, Reference(s): 1.25 Insubordination, 1.56 Discipline, 2.19 Time Records, 4.1 Discipline Procedure." Exh. E. The record shows that another Letter of Counseling was sent to Plaintiff on September 13, 2017 regarding the submission of a self-appraisal form. Exh. F.

In the "2016 Performance Recap/2017 Yearly Performance Appraisal/2018 Performance Objectives," Defendant noted both Plaintiff's history of performance issues and more recent improvements. The document began by stating that Plaintiff "goes above and beyond in fostering a positive working environment and appears to adhere to the cultural norms." Exh. G. That

document also states that Plaintiff's "biggest struggles have been with time and attention management, prioritization, and delegation." *Id.* Following attendance at an "Attention Management" training, Plaintiff had a "marked improvement . . . in her performance." *Id.* In fact, "[f]or the first time in her employment with" Defendant, Plaintiff was keeping up with "her caseload when it c[ame] to record review and case completion." *Id.*

The next instances of performance issues arose in the lead up to and around the time of Plaintiff's FMLA leave. Following leaving work with chest pains on August 9, 2018, Plaintiff went on FMLA leave from August 9, 2018 to August 21, 2018. Compl. ¶ 10. Unum, the county's medical leave administrator, granted Plaintiff FMLA leave for this time period for anxiety and depression. *Id.* ¶ 13. On August 10, 2018, the Coroner sent Plaintiff an email that stated, in part, "As previously discussed following the incident on 08/03, I was planning to meet with you on your workweek of 08/08 to discuss your job. However, now that you are on leave, we will have to move this meeting to a later date when you return." Exh. N; Exh. A 61:4–20.

On August 30, 2018, the Coroner, the Chief Deputy Coroner, and Plaintiff met to discuss Plaintiff's job performance. Exh. A at 67:17–23, 79:16–22. In the August 30, 2018 meeting, the Coroner's proffered reasons for considering termination were dereliction of duty, making fraudulent records, using the Internet for personal use, and being consistently behind. Exh. A at 79:23–80:2; Exh. U. The Coroner described that Plaintiff's web history revealed that she would spend an average of two hours per shift on the Internet to look at a variety of non-work-related things. Exh. S. The Coroner pointed out that some of those Internet uses coincided with times that Plaintiff had stated on her timecard that she was working on reports. *Id.* Also, the Coroner remarked on one occasion in which Plaintiff used the Internet during a time that she had requested overtime. *Id.* Plaintiff admits that she violated Defendant's policy by being on the Internet, "using

13

Facebook, looking at puppies, shopping for clothes, and doing [her] photography websites." Exh. A at 72:7–13.

At the conclusion of the August 30, 2018 meeting, the Coroner decided to place Plaintiff on a six-month probationary period. Exh. W. The oral terms of the probation included that Plaintiff was not to use the Internet for personal use while working, completing tasks by their deadlines, following all written polices, and asking questions when she has them. *Id.*; Exh. A at 76:22–77:8. The Coroner emphasized that violation of any term of probation would result in termination. Exh. W. It does not appear that the terms of probation were ever put into writing. *See* Exh. 1 ¶ 11.

In September 2018, Plaintiff admits to using the Internet for personal use on at least two occasions. First, she went to a United Power account website on behalf of her son who was experiencing a power outage. *Id.* ¶ 4. Second, she showed her colleagues photographs from her photography website. *Id.* ¶ 11. Plaintiff also admits to visiting the Bennett Fire Department website but argues that this was not for personal use since it was to help a coworker obtain a similar IV certification that she had. *Id.* ¶ 4. Defendant responds that it "is at a loss for how this I.V. class could possibly be work related," since "I.V.'s are not used on cadavers." Reply at 3. Defendant has submitted evidence of other Internet use by Plaintiff, but the parties dispute whether such instances were work-related. Regardless of these factual disputes, it is undisputed that Plaintiff admits to two instances of personal Internet use.

As to Plaintiff's actual termination, no written evidence has been submitted; put differently, there appears to be no document that outlines the exact reasons for Plaintiff's termination. As a result, and as Plaintiff argues in her response, there seems to be some differences in the reasons for termination stated in the record and in Defendant's briefing. In the Rule 30(b)(6) deposition,

the Coroner stated that Plaintiff was terminated for violating her probation for "not working and using her Internet for personal usage, and her retaliating against her coworkers and not taking responsibility for her actions." Exh. 3 at 39:14–23. In its Motion, Defendant emphasizes that its legitimate reasons for termination included years of Plaintiff failing to meet job performance requirements, consistently being behind in her work, failing to listen to management instructions, failing to communicate effectively, and spending hours on the Internet while lying about it on her timecards. Mot. at 13. Defendant's reply has sections dedicated to Plaintiff being behind on her work, Reply at 4, the alleged timecard fraud, *id.* at 4–5, and whether Plaintiff violated Defendant's Secondary Employment policy, *id.* at 5.

The submitted audio clips of the August 30, 2018 meeting make clear that the Coroner placed Plaintiff on probation under the terms the Court already mentioned (namely, not using the Internet for personal reasons while working, completing tasks by their deadlines, following written polices, and asking questions when Plaintiff has them). Exh. W. The evidence in the record shows that Plaintiff violated those terms only through her (admitted) personal use of the Internet. Exh. 1 ¶ 11. Plaintiff contends that "[i]t was common practice for the death investigators to moderately use the office Internet for personal purposes." *Id.* Even if true, Plaintiff was in the unique situation of being on probation. Plaintiff should have understood that she was in a different position as other employees and facing heightened scrutiny. Moreover, in her meeting with the Coroner, Plaintiff was specifically told that a violation of any term of probation would result in termination. Exh. W. She tempted fate by using the Internet at least twice for personal purposes. The Court does not find Plaintiff's argument that her minor violations of the Internet policy should be either forgiven or treated as pretext as persuasive. *See Peterson v. Exide Technologies*, 477 F. App'x

474, 478 (10th Cir. 2012) (finding the plaintiff's argument that minor violations show pretext unavailing).

When viewing the evidence in a light most favorable to Plaintiff, her best pieces of evidence of pretext come from the Coroner herself. First, in the August 30, 2018 meeting, the Coroner told Plaintiff, "Quite honestly, if you had all your crap done, I wouldn't care—wouldn't care if you slept, wouldn't care if you were on the Internet—wouldn't care." Exh. S at 2:38–46; Exh. 3 60:19–24. Plaintiff argues this statement shows that her termination based on her Internet usage was merely a farce. *See* Resp. at 13. However, when viewed in the proper light, the Court reads this statement as remarking that if there were no other performance issues, the Internet usage would not be as big of a problem. In other words, Plaintiff's other performance issues were exacerbated by, at least in part, the Internet usage. This makes sense when considering that Plaintiff admits to spending anywhere from sixty to ninety minutes per shift on the Internet for personal matters. Exh. 1 ¶ 5. Considering the remark in the context of the record as a whole, the Coroner's statement does not create a genuine dispute as to whether the record shows "evidence that the employer didn't really believe its proffered reasons for [termination]" such that Defendant was "pursuing a hidden discriminatory agenda." *Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1211 (10th Cir. 2010).

Second, on August 10, 2018, the Coroner sent an email to Shawn Kandler, Psy.D., of Nicoletti-Flater and Associates regarding Plaintiff's anticipated FMLA leave. Exh. 2. In the email, the Coroner described her August 3, 2018 call with Plaintiff in which Plaintiff allegedly stated that she was not going to perform an exam on a decomposed body because she was feeling "burnt out." *Id.* The Coroner apparently indicated that she would be meeting with Plaintiff on August 9, 2018 to "discuss this incident, [Plaintiff's] overall performance, and whether or not she

can do this job." *Id.* As already mentioned, on the morning of August 9, Plaintiff had "chest pain" and left the office in an ambulance. *Id.* The Coroner commented that "[i]t now appears that she is going on FMLA via that route." *Id.* Near the end of the email, the Coroner stated, "It is obviously highly suspect that this employee was going to try to abuse" the mental health program. *Id.* Finally, the Coroner asked that Shawn Kandler's "organization refer any of [the coroner's] employees, that may be seeking psychological FMLA leave, to their own private psychologist." *Id.*

Plaintiff asserts that this email shows that the Coroner "thought that [P]laintiff was faking her disability." Resp. at 15. Viewing the email in the light most favorable to Plaintiff, it is fair to read the email as expressing skepticism over Plaintiff's disability. However, that skepticism appeared to have no bearing on Plaintiff's ability to obtain FMLA leave; that is, the Coroner merely asked that the FMLA leave go through Plaintiff's therapist, Exh. 2, and Plaintiff's leave was approved in full, Compl. ¶ 13. The email cannot reasonably be read to suggest that the Coroner intended to retaliate against Plaintiff for her FMLA leave. In fact, the Coroner stated that she supported Plaintiff to be seen through the mental health program "during her leave of absence." Exh. 2. If anything, the email suggests that the Coroner believed that Plaintiff chose to use FMLA leave to avoid a discussion with her regarding employment performance issues. As with the other statement by the Coroner, this email does very little to provide evidence of pretext by Defendant.

Plaintiff lastly relies on the changing of Defendant's reasons for termination as evidence of pretext. As the Court described earlier, she argues both that Defendant's reasons here are different from the ones at the time of termination and that there are now *post-hoc* reasons. For support, Plaintiff cites to the proposition that "[a] plaintiff can show pretext by revealing '. . . contradictions in the employer's proffered legitimate reasons for its action that a reasonable

17

factfinder could rationally find them unworthy of credence." *Plotke v. White*, 405 F.3d 1092, 1102 (10th Cir. 2005). Therein lies the problem for Plaintiff's position. Plaintiff must show *contradictions* in Defendant's legitimate reasons. While Defendant has undoubtedly provided different reasons for termination at different times in this case, none of them have been contradicted by the record or are in contradiction with one another. For example, Defendant has offered as a legitimate reason in its briefing on the Motion the allegation that Plaintiff committed timecard fraud. That reason was discussed with Plaintiff in the August 30 meeting and forms part of the understanding to place her on probation. Though she may not have been terminated specifically for that reason, the record bears out why Defendant has a legitimate reason for termination on that basis. The Court finds that there is no contradiction in Defendant's reasoning in simply raising the issue in the briefing. The same is true of Defendant's other reasons.

Moreover, the Court does not find that any of Defendant's reasons are *post-hoc*. In this case, p*ost-hoc* justifications would be after-the-fact reasons for termination. *See Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 56 (1st Cir. 2000). In *Plotke*, the Tenth Circuit found that the evidence in the record showed that the employee had no performance issues prior to the incident that led to termination. 405 F.3d at 1103. The record in that case also revealed that the employer offered no other reasons for termination except the incident at issue. *Id.* On that ground, the Tenth Circuit held that the employer's additional reasons for termination offered in litigation constituted evidence of pretext. *Id.* Here, Plaintiff has years of documented employment issues with Defendant. Furthermore, the reasons offered for termination in this litigation are not being raised for the first time without some basis in the record. Accordingly, the Court finds no authority on which to conclude that Defendant's reasons are *post-hoc* and thus evidence of pretext.

18

"The plaintiff's burden 'is only to demonstrate a genuine dispute of material fact as to whether the proffered reasons were unworthy of belief.'" *Deffenbaugh v. Winco Fireworks Intern., LLC*, 2009 WL 662643, at *3 (D. Kan. Mar. 11, 2009). In carrying this burden, the plaintiff can point to evidence that allows "for an inference that the 'employer's proffered non-discriminatory reasons [were] either a *post hoc* fabrication or otherwise did not actually motivate the employment action." *Plotke*, 405 F.3d at 1102–03 (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)). After careful consideration of the record, the only reasonable evidence of pretext is the temporal proximity of the termination to Plaintiff's FMLA leave. However, "in analyzing pretext, temporal proximity alone is insufficient to raise a genuine issue of material fact concerning pretext." *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 976 (10th Cir. 2017) (quoting *Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1203 (10th Cir. 2007)). Beyond that, Plaintiff is left with "mere conjecture that the employer's explanation is pretext [which] is insufficient to defeat summary judgment." *McClelland v. CommunityCare HMO, Inc.*, 503 F. App'x 655, 659 (10th Cir. 2012).

## CONCLUSION

Accordingly, for the foregoing reasons, Defendant's Motion [filed January 25, 2021; ECF 19] is **granted**. The Court directs the Clerk of the Court to enter judgment in Defendant's favor and to close this case.

Entered this 11th day of March, 2021, at Denver, Colorado.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge